UNITED STATES DISTRICT COURT
                           DISTRICT OF MASSACHUSETTS

|                                    |                          |
|------------------------------------|--------------------------|
| JOSE LUIS DIAZ-PENA,               )                          |
|                                    )                          |
|         Petitioner                 )                          |
|                                    )                          |
|         v.                         ) CIVIL ACTION             |
|                                    ) NO. 08-11484-WGY         |
| WARDEN,                            )                          |
| Federal Correctional               )                          |
| Institution                        )                          |
| Fort Dix, New Jersey               )                          |
|                                    )                          |
|         Respondent.                )                          |

                               MEMORANDUM AND ORDER

YOUNG, D.J.                                            November 12, 2008

   **Ignoring the Guidelines - Officially**

   [I]n judicial districts with unusually high volumes of
   drug and immigration offenses (primarily along our
   border with Mexico), the [Justice] Department simply
   dispenses with the Guidelines altogether to secure more
   flexibility (and thus more pleas).  These are the so-
   called "fast track" programs.  While Attorney General
   Ashcroft has attempted to centralize and rein in these
   programs,[1] they still exist and there is every
   indication that they will continue to for the
   foreseeable future.  As implemented, these programs
   constitute a wholesale jettisoning of the Guidelines in
   order to "move the business."  No wonder the Guidelines
   are held in such derision by the states,[2] when the much

---

   [1] See Sept. 22, 2003 Memorandum from Attorney General John
Ashcroft Setting Forth Justice Department's Charging and Plea
Policies §§ I.B.2, II.D.2.b., reprinted in 16 FED. SENT. REP. 129
(2003).

   [2] See Richard S. Frase, State Sentencing Guidelines: Still
Going Strong, 78 JUDICATURE 173, 176 (1995) (noting states'
unanimous rejection of the Guidelines' "real offense" approach);

>         vaunted guideline "uniformity" (and the congressional
>         command) does not even apply in Arizona, Southern
>         California, New Mexico and Southern and Western Texas.[3]
>         More serious, of course, is the constitutional command
>         that the national law apply equally throughout the
>         United States.[4]  Offenders are properly complaining of
>         equal protection violations in view of the "here it
>         applies, here it doesn't" nature of the Guidelines.[5]

United States v. Green, 346 F. Supp. 2d 259, 276-277 (D. Mass. 2004) [footnotes altered].

So did this Court excoriate the fundamental unfairness of "fast track" programs in the days when all federal sentences were

---

see also American Law Institute, Model Penal Code: Sentencing 5 (Report, Apr. 11, 2003) ("[I]t is essential to state at the outset that the proposals assembled here owe almost nothing to federal law, but are inspired by the more numerous and more successful commission-guideline structures at the state level.").

[3] In 2001, 5,928 of the nation's 10,026 non-cooperation related downward departures were issued in the five districts located in these regions.  See U.S. Sentencing Comm'n, 2001 Sourcebook of Federal Sentencing Statistics 53-55 tbl.26 (2001), at http://www.ussc.gov/ANNRPT/2001/SBTOC01.htm (last visited November 10, 2008); see also Alan Vinegrad, The New Federal Sentencing Law, 15 FED. SENT. REP. 310, n. 29 (2003).  In the Southern District of California, an astonishing 50.5 percent of offenders receive non-cooperation related departures, whereas the figure in the Eastern District of California is 7.9 percent. U.S. Sentencing Comm'n, supra, at 53-55 tbl.26.

[4] U.S. Const. amend. V; see Bolling v. Sharpe, 347 U.S. 497, 500 (1954) (holding that the Due Process Clause of the Fifth Amendment places the same restrictions on actions by the federal government that the Equal Protection Clause of the Fourteenth Amendment places on state governments).

[5] See, e.g., United States v. Banuelos-Rodriguez, 215 F.3d 969, 978 (9th Cir. 2000) (en banc) (holding that disparities arising from "fast track" programs in neighboring districts did not justify a downward departure); United States v. Bonnet-Grullon, 212 F.3d 692, 710 (2d Cir. 2000) (similar).

unconstitutional due to the oxymoronic "mandatory guidelines." This Court was the first one so to hold, Green, 346 F. Supp. 2d at 317-18, and, while this decision was reversed on other grounds, United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006), the Court was ultimately vindicated in United States v. Booker, 543 U.S. 220, 244 (2005), upon reasoning presaged in Green.

The circuit courts gave ground grudgingly. United States v. Richardson, 477 F. Supp. 2d 392, 404 (D. Mass. 2007) ("[T]he circuit courts moved almost in lockstep to shore up the now thoroughly discredited Sentencing Guidelines."). In the First Circuit, for example, it was mandated that the guidelines, although advisory, were still due "substantial weight," United States v. Jimenez-Beltre, 440 F.3d 514, 516, 518 (1st Cir. 2006), the policy determinations of the Sentencing Commission were inviolate, United States v. Pho, 433 F.3d 53, 62, 64-65 (1st Cir. 2006), and sentencing disparities arising from the availability of "fast track" programs in other areas of the country could not be considered as a basis for a variance from the Sentencing Guidelines. United States v. Andujar-Arias, 507 F.3d 734, 739, 742-43 (1st Cir. 2007). Once Gall v. United States, 128 S.Ct. 586, 596-597 (2007) had abrogated Jimenez-Beltre, however, and Kimbrough v. United States, 128 S.Ct. 558, 564 (2007) had done the same to Pho, the First Circuit, when it next revisited the issue, held that it was appropriate to consider the disparities

caused by the "fast track" programs in fashioning an individualized sentence.  United States v. Rodriquez, 527 F.3d 221, 227-29 (1st Cir. 2008).

The petitioner here, Jose Luis Diaz-Pena ("Diaz-Pena"), seeks to capitalize on this sea change in federal sentencing practices.  On February 4, 2008, Diaz-Pena pled guilty to the charge of illegal re-entry.  On May 5, 2008, this Court sentenced him to twenty-nine months in custody followed by three years of supervised release.  The Rodriguez decision was handed down one month later.  Diaz-Pena never appealed but here he brings a timely filed petition for the writ of habeas corpus alleging that his counsel was ineffective in failing to argue for a lesser sentence due to "fast track" disparities and in failing adequately to counsel him on the merits and chances of success of an appeal.  To succeed, Diaz-Pena must show, inter alia, that he was actually prejudiced by his counsel's alleged shortcomings. See Strickland v. Washington, 466 U.S. 668, 692, 697 (1984); United States v. Frady, 456 U.S. 152, 164-66 (1982).

Diaz-Pena suffered no prejudice here, albeit not for the somewhat formalistic reason advanced by the government.

To understand why this is so, it is necessary briefly to rehearse the sentencing practices of this Court, practices that the Court followed in sentencing Diaz-Pena.  Sentencing in this session of the Court proceeds in four steps:

**First**, the Court determines the highest constitutionally reasonable sentence.  This sentence is defined as the top of the guideline range established by the verdict of the jury or the admissions of the defendant at the time of his plea without regard to any mitigating factors, e.g. minimal role in the offense.  Although remedial Booker counsels the contrary, 543 U.S. at 266-67, this Court imposes no sentence higher than the highest constitutionally reasonable sentence.[6]  To do so, simply cannot be squared with constitutional Booker.  This Court fully explained its reasoning in United States v. Kandirakis, 441 F. Supp. 2d 282 (D. Mass. 2006).

**Second**, the Court plots, from all available databases, the average sentence actually imposed for like offenses.  See United States v. Birkett, 501 F. Supp. 2d 269, 275-76 (D. Mass. 2007).  See United States v. Griffin, 494 F. Supp. 2d 1, 7 (D. Mass. 2007), rev'd on other grounds 524 F.3d 71, 85 (1st Cir. 2008).  The Court takes this step to determine the degree of the deference to be accorded to the Sentencing Guidelines.  This is appropriately the second step in the analysis to avoid the effects of "anchoring."  See Judge Nancy Gertner, What Yogi Berra

---

[6] Proper calculation of the Sentencing Guidelines of course includes mitigating factors as well.  This Court has sentenced higher than the top of this adjusted range although never higher than the highest constitutionally reasonable sentence.  See United States v. Birkett, 501 F. Supp. 2d 269, 277-79 (D. Mass. 2007).

Teaches About Post-Booker Sentencing, 115 YALE L.J. POCKET PART 137 (2006), http://www.thepocketpart.org/2006/07/gertner.html ("Anchoring is a strategy used to simplify complex tasks, in which 'numeric judgments are assimilated to a previously considered standard.'  When asked to make a judgment, decision-makers take an initial starting value [i.e., the anchor] and then adjust it up or down.  Studies underscore the significance of that initial anchor; judgments tend to be strongly biased in its direction.  In effect, the 300-odd page Guideline Manual provides ready-made anchors." (quoting Birte Englich & Thomas Mussweiler, Sentencing Under Uncertainty: Anchoring Effects in the Courtroom, 31 J. APPLIED SOC. PSYCHOL. 1535, 1536 (2001))).  See also Jimenez-Beltre, 440 F.3d at 530 (Lipez, J., dissenting) (criticizing trial judge who framed the issue as whether non-guideline sentence would fail to comply with sentencing statute rather than asking whether guideline sentence would comply:  "Word choices matter because they reflect mental processes, and mental processes matter because they organize information for the decision-maker.").  Because this is the step that disproves Diaz-Pena's claims of prejudice, the Court returns to it below.

**Third**, the Court properly and accurately calculates the advisory Sentencing Guidelines range, affording counsel an opportunity to be heard and resolving any disputes.

**Fourth**, and by far the most important step, the Court hears from counsel and the particular offender at the bar, considers counsel's recommendations, and affords the offender his right to allocution, carefully considering what he has to say as well.

Only once this entire procedure has been followed does this court impose sentence.

Returning now to the second step in the analysis, this Court routinely plots the average sentences drawn from four different databases.

**First**, the Court looks to the website of the United States Sentencing Commission to determine the average sentence for like offenses nationwide.  This has the benefit of yielding a nationwide average of thousands of sentences.  It is flawed, however, as the Sentencing Commission groups offenses into broad categories such as "drugs," "fraud," and "immigration."

**Second**, the Court plumbs the same source for the cognate data on sentences within the First Circuit.

**Third**, the Court consults the confidential database maintained by our Probation Department concerning sentences within the District of Massachusetts.  This is probably the most salient data point since it is more offense-specific than the Sentencing Commission's website, it collects a statistically significant number of sentences, and those sentences are imposed by the Court's closest colleagues.  See Richardson, 477 F. Supp.

2d at 403-05.  Unfortunately, these data are confidential and, respecting that fact, the Court announces only the average in the course of a sentencing proceeding.

**Fourth**, the Court consults an easily searchable, publicly available database of its sentences maintained by Mr. Donald Womack, the official court reporter assigned to this session of the court.  See Sentencing Transcripts Database, http://www.donwomack.com/search.cfm.  In one sense, this is the most accurate of the databases as it is broken down by specific sub-section of the criminal code.  Because it goes back only four years, however, it naturally contains only a handful of sentences on a particular violation – a group that is less than statistically significant.  The Court always refers to this database, however, as a check for internal consistency.

The Court does **not** use any of these four data points directly in sentencing an offender.  They are, after all, averages and every particular sentence is, and ought be, individual to the offender.  The four data points do, however, powerfully affect the degree of the deference this Court accords to the advisory Sentencing Guidelines.  This Court now welcomes the advice of the Sentencing Commission.  See United States v. West, 552 F. Supp. 2d 74, 86 (D. Mass. 2008).  Yet such advice, to be useful, must be accurate, i.e. it must accurately reflect what courts actually do in sentencing actual offenders given the

myriad differences in offences and offenders.  Thus, if the data points fall roughly within or around the sentencing guideline range calculated in a particular case, that range is likely to be persuasive to the Court.  Similarly, if the data points all fall markedly below the case-specific guideline range,[7] then the advice of the Sentencing Commission, standing alone, is likely to be far less persuasive to the Court as the data all indicate that judges in the average case are imposing sentences below that guideline range.

Following this analysis insured that the sentencing of Diaz-Pena fully considered the effect of "fast track" programs in other districts.  It is true that today's criminal justice system is all about the plea rate; it concerns itself only peripherally with trials.  See generally George Fisher, Plea Bargaining's Triumph, 109 YALE L.J. 857 (2000).  It is equally true that, overwhelmed by immigration offenses along our southern border and unable to garner an adequate budget to prosecute them all, the Attorney General has been forced to sweeten his plea deals in these districts in order to maintain a plea rate that staves off inundation.  See Green, 346 F. Supp. 2d at 276-77.  The resulting "fast track" programs are still a stain on the notion of equal justice under law and still result in inter-district disparities

---

[7] This Court has never seen a case where all four data points fell markedly above a properly calculated guideline range.

9

that are ameliorated albeit not remedied by rendering the guidelines advisory.  Nevertheless, in this Court, to the extent the Attorney General indulges in "fast track" programs and demeans the Sentencing Guidelines, the average nationwide sentence for such immigration offenses is reduced, and the persuasiveness of the advisory Sentencing Guidelines is likewise reduced when this Court considers an appropriate sentence for such offenses.

Diaz-Pena had the protection of all these procedural safeguards.  His sentence came about as the result of following all these generalized steps and then focusing extensively on his particular offense and everything the Court knew about him as an individual.  Here, Diaz-Pena had a substantial criminal record that placed him in Criminal History Category III.  See Judgment Order [Doc. No. 9] at 7.  Accordingly, the properly calculated guidelines range fell in its entirety **above** the sentence actually imposed on Diaz-Pena.  As the judgment and commitment order reflect, this Court departed downward due to "mitigating factors" among them the presence of "fast track" programs along our Southwest border.  The Court carefully considered each of the factors enumerated in 18 U.S.C. § 3553a before arriving at Diaz-Pena's individual sentence. He is simply mistaken in thinking that, had his counsel pressed for a more lenient sentence in light of the "fast track" programs in other districts, anything

would have changed.  It would not.  This Court was completely cognizant of the inequities posed by those programs and had already factored their existence into its analysis as described above.

His second claim is equally flawed.  Because, in fact, Diaz-Pena has no meritorious grounds for an appeal, he can hardly claim his counsel was deficient in his advice.

For these reasons, Diaz-Pena's petition [Doc. No. 1] must be, and hereby is, DENIED.

SO ORDERED.

> By the Court,
>
> /s/ William G. Young
> WILLIAM G. YOUNG
> DISTRICT JUDGE